UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROY J. MEYERL<br><br>Plaintiff,<br><br>v.<br><br>CARRINGTON MORTGAGE COMPANY<br><br>Defendant. | Civil Action No.:<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This action arises out of Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

## JURISDICTION

2. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4. Plaintiff ROY J. MEYERL (hereinafter "Plaintiff") is a natural person who resides in Sarver, Butler County, Commonweath of Pennsylvania, and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

5. Defendant CARRINGTON MORTGAGE COMPANY, LLC (hereinafter "Defendant") is a foreign limited liability company registered as active with the Pennsylvania Department of State and headquartered at 2002 Summit Boulevard, Sixth Floor, Atlanta, Georgia, 30319. For the purposes of this action, Defendant is

a "furnisher" of consumer information as that term is used in 15 U.S.C. § 1681i and 15 U.S.C. § 1681s-2(b).

## **PURPOSE OF THE FAIR CREDIT REPORTING ACT**

7. Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (National Consumer Law Center, 2nd ed. 2006).

8. Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

9. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

10. The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*,"

and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 8 (National Consumer Law Center, 5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

11. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 8 (National Consumer Law Center, 5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

12. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 10 (National Consumer Law Center, 5th ed. 2002).

13. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez *et. al.*, FAIR CREDIT REPORTING 5 (National Consumer Law Center, 5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

14. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness, but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

15. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003, but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. (Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf). Defendant is a data furnisher under 15 U.S.C. § 1681s-2(b).

16. The credit industry (CDIA "About CDIA" on the website Industry Association, www.cdiaonline.org) has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

17. Consumer reporting agencies Experian, Trans Union, Innovis and Equifax, the Defendant, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers, such as Defendant to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit

reporting industry. *See* 15 U.S.C. § 1681i(a)(5)(D).

18. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

19. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued by Credit Reporting Agencies (CRAs) to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

20. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification (ACDV) electronic form.

21. Each ACDV has many fields in its body for use in effecting thorough and complete communications between data furnishers, such as Defendant, and the credit reporting agencies, including Equifax etc.

22. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

23. ACDV documents are "interim" communications between data furnishers, such as Defendant, and any CRA to whom it is directed.

24. However, upon information and belief, data furnishers, such as Defendant, also report monthly by an electronic means to each CRA telling the CRA the current accruing credit history of the consumer upon whom it is reporting.

25. It appears, upon information and belief that Defendant has communicated in an

5

inconsistent and confusing manner since before December of 2014 to the CRAs about Plaintiff.

26. The results of such specific inconsistent communication and CRA reporting are set out   below.

## FACTUAL ALLEGATIONS

27. Before 2000, Plaintiff purchased a house and mortgaged that home with New Century Bank and eventually that mortgage was serviced through Defendant. The mortgage had an identification number of 1508458.

28. Due to some unforeseen hardship, Plaintiff amassed a significant amount of debt and so he filed for Chapter 7 Bankruptcy in October 2005, file number 2:05-BK-38931, in federal court in the Western District of Pennsylvania.

29. In April, 2006, the Bankruptcy Court issued an order discharging Plaintiff's debts listed in the Chapter 7 case.  The mortgage loan owed to or serviced by Defendant was therein discharged.

30. Defendant received notice of the Plaintiff's bankruptcy and the discharge.

31. Subsequent to the bankruptcy discharge, Plaintiff continued to make and Defendant continued to accept payments.

32. However, because the loan that Defendant was servicing had been discharged any payments, whether timely or late, should not be reported per the industry standard promulgated by the CDIA, of which both Defendant and the CRAs are members.

33. Specifically in June through September 2014 Defendant erroneously began to report Plaintiff's discharged loan as 30 and 60 days late which was false and derogatory because nothing should have been reported about the discharged debt..

34. Moreover, Defendant failed to properly report that the loan had been discharged and instead continued to falsely report that the loan had an existing balance of greater than $85,000.

35. Plaintiff was unaware of the inaccurate reporting until he was initially denied for credit by his mortgage broker at the end of December 2014 and beginning of 2015.

### *Plaintiff's First Disputes*

36. In December 2014, after learning that he had been denied credit due to inaccuracies on his credit profile, Plaintiff wanted to ensure that all of his creditors, including Defendant, were reporting Plaintiff's accounts completely and accurately as required by the FCRA. *See* 15 U.S.C. § 1681s-2(a) (requiring that furnishers of information provide accurate information).

32. Plaintiff received his credit report compiled by non-party Equifax Information Services, LLC (hereinafter "Equifax") on December 23, 2014, from Equity Lending in Zelienople, Pennsylvania.

33. Listed as "included in or discharged through Bankruptcy Chapter 7" in Plaintiff's above referenced credit report from Equifax was Plaintiff's mortgage with Defendant which also included the balance of the loan and some late payments since 2014 long after the Bankruptcy discharge and which according to CIDA protocol and Metro II should not be reported in that or any manner.

34. Plaintiff's mortgage account with Defendant was listed by and published to others with the balance of $85,725 and a status of "open".

35. On December 30, 2014, Plaintiff sent a dispute letter to Equifax, requesting that it change information in Plaintiff's credit report to reflect that Plaintiff's mortgage with Defendant was being reported accurately.

36. Equifax in turn notified Defendant through an Automated Consumer Dispute Verification form (ACDV) that instructed Defendant to verify the accuracy of all aspects of Defendant's reporting of the Plaintiff's account.

37. Defendant failed to conduct a reasonable investigation in violation of 15 U.S.C. §1681s-2(b) when it (a) failed to remove the 2014 late payment history (which was impossible since the loan was discharged in 2006), (b) failed to permanently update its records to prevent the loan balance and past due balances from being reported in subsequent month tape reporting and (c) failed to update the account as disputed in the compliance condition code field with "XB".

38. The Defendant's agent who performed the investigation was Heather Burkhammer.

39. On January 31, 2015, Plaintiff received a reinvestigation report from Equifax which informed him that the Carrington account had been "updated to report paid in full".

40. Further, Equifax reported that Plaintiff's mortgage with Defendant had been "included in BANKRUPTCY Ch 7".

43.   Defendant's violations related to the initial dispute were willful and/or reckless and entitle Plaintiff to damages pursuant to 15 U.S.C. § 1681n.

45.   Shortly thereafter Defendant reverted back to the incorrectly reporting via monthly tape Plaintiff's account as having an $85,000 balance and continued to report that the mortgage loan was significantly late in June through September 2014.

46.   Plaintiff learned of the Defendant's inaccurate reporting when he was denied credit again in March 2015 from Equity Lending Group due to the false reporting by Defendant.

### *Plaintiff's Second Dispute*

47.   Plaintiff again disputed the Defendant's reporting with Equifax on April 14, 2015.

48.   This second dispute triggered another ACDV being sent from Equifax to Defendant instructing it to verify the accuracy of all account information.

49.   Again Defendant failed to conduct a reasonable investigation in violation of 15 U.S.C. §1681s-2(b) when it (a) failed to remove the 2014 late payment history (which was impossible since the loan was discharged in 2006), (b) failed to permanently update its records to prevent the loan balance and past due balances from being reported in subsequent month tape reporting and (c) failed to update the account as disputed in the compliance condition code field with "XB".

50.   Defendant's agent Heather Burkhammer again performed the failed investigation.

51.   The reinvestigation report from Equifax dated May 8, 2015, reported Plaintiff's account and account history with Defendant as being included in a Chapter 7 Bankruptcy and no account payment history however, Defendant failed to take

steps to insure that the deleted balance and late payment history were permanently changed and would not re-report in the next monthly reporting cycle.

52. The violations of the FCRA related to the second dispute were willful and/or reckless and entitle Plaintiff to damages pursuant to 15 U.S.C. § 1681n.

53. Subsequently, Plaintiff sought financing again in June 2015 and was denied after it was revealed that Defendant was again re-reporting the $85,000 loan balance and the late payments in 2014.

54. Defendant's inaccurate and derogatory reporting of Plaintiff's loan resulted in Plaintiff being unable to secure the financing he needed causing him great anxiety, emotional distress, loss of credit opportunities, and feelings of despair.

### *Plaintiff's third disputes*

55. Plaintiff received his tri-merge credit report dated June 17, 2015, from Equity Lending Group.

56. On that report it showed Equifax reporting Plaintiff's mortgage with Defendant was not noted as being "included in Bankruptcy" but showed the account as open, late payments in 2014, and high credit which is inconsistent with the CDIA standard.

57. Plaintiff sent a third dispute letter to Equifax on July3, 2015 requesting that it change information in Plaintiff's credit report to reflect that Plaintiff's mortgage with Defendant accurately.

58. This third dispute triggered Equifax to send a third ACDV to Defendant instructing it to investigate and verify all aspects of the reporting of the Plaintiff's loan account.

59. Again Defendant failed to conduct a reasonable investigation in violation of 15 U.S.C. §1681s-2(b) when it (a) failed to remove the 2014 late payment history (which was impossible since the loan was discharged in 2006), (b) failed to permanently update its records to prevent the loan balance and past due balances from being reported in subsequent month tape reporting and (c) failed to update the account as disputed in the compliance condition code field with "XB".

60. Defendant's agent Vicki Fuller this time performed the failed investigation.

61. The fact that multiple ACDV investigators employed by Defendant could not rectify the false and derogatory reporting is evidence of a widespread and systematic misunderstanding of the credit reporting communication process.

62. Defendant's failure to utilize the Compliance Condition Code field demonstrates a lack of knowledge for Metro II codes and the use thereof.

63. On July 14, 2015, a reinvestigation report came from Equifax to Plaintiff which showed that it has information that will show the credit history with Defendant was again attempted to be updated but not permanently as the following month Defendant re-reported in the monthly tape cycle the same inaccurate and false information.

**PLAINTIFF'S DAMAGES**

64. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as

11

though fully stated herein.

65. As a result of Defendant's violations, Plaintiff has suffered damage in the form of damage to his credit profile, weakening of his credit worthiness and calling his general reputation into question, increase of his debt to income ratio and depletion of his credit score.

66. It was important to Plaintiff's psychological well-being and sense of self-worth that Plaintiff's credit history be accurately reported to all who asked to see it.

67. Plaintiff also suffered emotional distress in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, loss of focus at work and non-work settings, marital strife and fear as a result of Defendant's persistent unrelenting conduct.

68. As a result of Defendant's willful and/or negligent conduct, Plaintiff is entitled to actual, statutory, and punitive damages in addition to attorney's fees and costs as allowed by 15 U.S.C. §§ 1681o&n.

## **TRIAL BY JURY**

69. Plaintiff is entitled to and hereby demands a trial by jury. U.S. Const. Amend. 7. Fed. R. Civ. P. 38.

## CAUSES OF ACTION

### COUNT I.

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT –

### 15 U.S.C. §§ 1681s-2(b) and 1681o&n.

70. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

71. The foregoing acts and omissions of Defendant constitute numerous multiple and intentional violations of the FCRA 15 U.S.C. § 1681s-(2)(b).

72. Pursuant to 15 U.S.C. §§ 1681n(a)(1)(A) and 1681o(a)(1), Defendant is liable for Plaintiff's actual damages caused by its failure to investigate, review, correct its records on Plaintiff and report accordingly to Equifax.

73. Defendant's conduct, actions, and inactions were willful, rendering it liable for punitive damages in an amount to be determined at trial pursuant to 15 U.S.C §1681n(a).

74. In the alternative, Defendant's conduct, actions, and inactions were negligent, rendering it liable for damages in an amount to be determined at trial pursuant to 15 U.S.C. §1681o(a)(1).

75. Plaintiff is entitled to recover costs and attorneys' fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. §§1681n and 1681o.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered against Defendant for:

- Actual damages suffered by Plaintiff as a result of the FCRA violations by Defendant in an amount to be determined at trial;
- Statutory and punitive damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1681n and § 1681o;
- Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681 *et seq.*; and,
- Other and further relief as may be just and proper.

Dated this 7th day of January, 2016.   Respectfully submitted,

By:   s/ James M. Pietz
James M. Pietz, Esq.
Pa. I.D. #55406
**FEINSTEIN, DOYLE, PAYNE AND KRAVEC**
429 Forbes Ave, 17th Floor
Allegheny Building
Pittsburgh, Pa. 15219
Telephone: 412-281-8400
Facsimile: 412-281-1007
jpietz@FDPK.com

Thomas J. Lyons, Esq. (MN 65699)
**LYONS LAW FIRM, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone:  (651) 770-9707
Facsimile:  (651) 770-5830
tlyons@lyonslawfirm.com
*To be admitted pro hac vice*

Thomas J. Lyons, Jr., Esq. (MN 0249646)
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone:  (651) 770-9707
Facsimile:  (651) 704-0907
tommy@consumerjusticecenter.com
*To be admitted pro hac vice*

**ATTORNEYS FOR PLAINTIFF**